IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 NOV 20 PM 3: 36

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| TERRI L. FISH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.: 02-PT-3039- E |
| | ) |
| REGIONAL HEALTH MANAGEMENT | ) |
| CORPORATION, d/b/a NORTHEAST | ) |
| ALABAMA REGIONAL MEDICAL | ) |
| CENTER, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**
NOV 2 0 2003

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Northeast Alabama Regional Medical

Center's ("NEARMC")(also referred to as "the Hospital") Motion for Summary Judgment, filed

on October 3, 2003.

### FACTS[1] AND PROCEDURAL HISTORY

NEARMC is a not-for-profit hospital serving residents of northeastern Alabama. On October

25, 1993, plaintiff Terri L. Fish ("Fish") began working for NEARMC as a secretary in the

Obstetrics Department. After graduating from nursing school, Fish began working for NEARMC

as a full-time registered nurse (RN) effective May 30, 1999, under the immediate supervision of

Nurse Manager Christine Word ("Word").

At Word's suggestion, on May 9, 2000, Fish submitted a FMLA leave request for April 28,

---

[1] The "facts" are as alleged and supported by the plaintiff or as not rebutted by the plaintiff.



2000 to July 28, 2000, due to pregnancy complications resulting in a miscarriage.[2] Word provided Fish with the appropriate FMLA paperwork and signed the Employee Status Report ("ESR") signifying that Fish was placed on leave effective April 28, 2000. On May 15, 2000, NEARMC conditionally approved the leave request pending medical certification, but Fish voluntarily returned to work on May 15, 2000.[3] Fish was unable to work several scheduled shifts during the time period she took FMLA leave.

On or about August 26, 2000, Fish changed from full-time to "PRN" at Fish's request, remaining under Word's supervision. According to the NEARMC employee handbook, nurses on PRN status work for an assigned department on an as-needed basis. As a PRN, Fish's work schedule and number of hours per week varied.

In October 2000, Fish suffered from placenta previa[4] while pregnant and was placed on physician-ordered bed rest from October 11, 2000 until November 3, 2000. Fish testified that she notified Word of her placenta previa, although Ms. Word denies any specific mention of placenta previa, just that Fish called in "sick" on October 11th and 12th. Fish never requested FMLA leave from Word or any other NEARMC employee for her placenta previa-related absences. During the prescribed period of bed rest, Fish was unable to work several scheduled shifts. As of October 2000, Fish alleges, she was FMLA-eligible, having worked 1311 hours for NEARMC in the year 2000 and having been employed by NEARMC for more than six months. When Fish returned to work, she

---

[2] The Hospital has a comprehensive FMLA policy provided to employees in an employee handbook and in a separate summary sheet. Fish admits to receiving and/or reading those summaries. Federal "5-in-1" posters on hospital bulletin boards further alert employees to their FMLA rights.

[3] The Hospital contends that Fish's return to work on May 15, 2000 cancelled her pending FMLA request.

[4] Fish defines placenta previa as follows: "Placenta previa is an obstetric complication that occurs in the second and third trimesters of pregnancy. It may cause serious morbidity and mortality to both fetus and mother. This is a pregnancy related medical condition."

2

submitted a doctor's excuse which indicated that her physician had placed her on bed rest.

From February 5, 2001 until February 18, 2001, Fish's physician again removed her from work due to bronchitis. Again, Fish testified to notifying Word of her condition, which Word testified was only relayed as "sickness" on February 5th, 9th, and 12th. Again, Fish never requested FMLA leave for these bronchitis-related absences from Word or anyone else at NEARMC.

From August 26, 2000 (the beginning of Fish's new PRN status) until March 13, 2001 (the date Word testified to deciding to discharge Fish), NEARMC asserts, the Hospital scheduled or attempted to schedule Fish to work on twenty-nine occasions, of which plaintiff was unavailable to work on twenty occasions. Of those twenty occasions, NEARMC asserts, Fish has identified seven occasions she claims were due to FMLA-qualifying reasons, i.e., absences related to Fish's October 2000 placenta previa and February 2001 bronchitis.[5]  Of the remaining thirteen occasions, NEARMC alleges, Fish undisputedly was unavailable for work for non-FMLA related reasons.[6]

_____

[5] In her opposition to summary judgment, the court observes, Fish's retaliation claim does not appear to be based on her February 2001 bronchitis-related absences. Specifically, Fish's opposition brief states: "Mrs. Fish's ineligibility for FMLA leave in February 2001 is immaterial to her retaliation claim."

[6] NEARMC's summary judgment submission lists Fish's alleged response to each NEARMC request to work from August 26, 2000 to March 13, 2001. Additionally, the NEARMC chart shows cumulative hours Fish had worked during the previous twelve-month periods for various dates. According to the chart, the following dates/reasons comprise the thirteen occasions (non-FMLA-related) when plaintiff did not work a scheduled shift or respond to a request to work a shift:

- 9/13/00 - Failed to answer telephone/respond to message
- 9/18/00 - Refused to work - scheduled to work elsewhere
- 9/22/00 - Refused to work - scheduled to work elsewhere
- 9/28/00 - Refused to work - sick
- 11/27/00 - Failed to answer telephone/respond to message
- 11/29/00 - Refused to work - sick
- 12/7/00 - Failed to answer telephone
- 12/18/00 - Refused to work - sick
- 12/27/00 - Refused to work - sick
- 1/27/01 - Refused to work - no reason noted
- 3/7/01 - Failed to answer telephone
- 3/8/01 - Failed to answer telephone/respond to message
- 3/13/01 - No-call, no-show.

On February 16, 2001, Fish received a written counseling from Word for accumulating eight call-in absences from February 16, 2000 until February 16, 2001.   Fish argues that the "call-ins" upon which this disciplinary action was based included Fish's May 2000 FMLA leave[7] and Fish's October 2000 placenta previa absences (which Fish contends would qualify for FMLA protection).[8] In her amended complaint, Fish alleges: "This write-up was intended to discourage Ms. Fish from exercising her right to take additional leave from work for a serious medical condition and/or her pregnancy." *See* Amend. Compl., ¶ 20.

Although Fish was scheduled to work March 13, 2001, she failed to appear or call in. On March 13th, Word testified, she decided to discharge Fish for non-availability to work.[9]   Word

_____

When questioned about absences/call-ins on this list, the court notes, Fish's answers vary. *See* Fish Deposition, pp. 82-96.  These responses include acknowledging certain absences/call-ins, not remembering other absences/call-ins, or testifying "I guess I did" regarding certain absences/call-ins.

Regarding Fish's March 13th absence, NEARMC notes a discrepancy between Fish's complaint, which states that Fish was unaware she was scheduled to work this day until she arrived at the Hospital the following day, and Fish's deposition testimony that Word "must have" called her to schedule her for work on that day and that Fish failed to notify her employer that she wasn't working.

[7] Plaintiff's amended complaint, the court observes, does not reference Fish's April/May 2000 absences.

[8] According to Word, written NEARMC policy provided that more than six accumulated absences could result in discipline, leading up to termination.  Word defined a "call-in" as "[w]hen you are scheduled to work a shift and you notify your nurse manager or nursing supervisor prior to that shift that you are not going to be able to work it." *See* Pl. Ex. 3 at 13.

The February 16, 2001 warning stated: "NEARMC policy states no more than 6 call-ins in a fiscal year is acceptable.  If you have more than 6 call-ins, this is a written warning, and any future call-ins will be subject to progressive disciplinary action up to and including dismissal, if appropriate and if long lasting modification of attendance record is not achieved.  Anyone absent three (3) days in a row, must have a doctor's work release to return to work."  The court notes that this written counseling does not list specific dates/circumstances for the eight alleged call-ins.

[9] Regarding the separate reasons of "unavailability to work" and "inability to fulfill PRN requirements" (the reason for plaintiff's termination stated in NEARMC's letter to Fish dated July 3, 2001), Word testified: "*Q: What is the difference between saying that she had an established pattern of [un]availability and saying she is unable to perform her PRN requirements?*  A: Not much difference.  *Q: Is there any difference?*  A: Not to my knowledge, not to me.*"

4

completed an ESR requesting that NEARMC terminate Fish's employment.  Fish was not asked to

sign the ESR[10] or participate in an exit interview.  By Word's account, Word was unable to contact

Fish on March 13, 2001 to notify Fish of her termination.  On March 14, 2001, it is undisputed that

Fish arrived at the Hospital and began working.  Fish was permitted to work that day, Word testified,

because Fish had already received patient care assignments, and Word did not want to compromise

patient care.  Fish has not worked for NEARMC since March 14, 2001.

On April 15, 2001, Fish gave birth to a daughter.  While in the hospital, plaintiff testified,

she first learned that her employment had been terminated.  The parties give differing accounts of

March 14, 2001.  On March 14, 2001, Fish alleges, Word told her only that she would not be

scheduled to work again until after the birth of her child, not that she was terminated.  Word, on the

other hand, testified that she did notify Fish about her termination on March 14, 2001.  The parties

agree that Fish never requested FMLA leave for childbirth and/or maternity leave for her April 15,

---

The court also notes a relevant portion of Word's affidavit:

> I did not discharge Ms. Fish because she had an excessive number of absences or for any
> particular absences at all.  Instead, I discharged her because she had an unacceptable pattern
> of unavailability during the time she was a PRN nurse.  Hospital policy at that time provided that
> a PRN employee could have no more than three "refusals" when requested to work.  A PRN
> employee would be credited with a refusal for either initially declining to work a shift when
> requested, notifying the Hospital that he or she would not be working a shift after previously
> agreeing to do so, failing to show for a scheduled shift without notice ("no call, no show"), or
> even failing to answer the telephone or to respond to a message requesting the employee to work.
> Based on the records I reviewed following Ms. Fish's no call, no show for a scheduled shift on
> March 13, 2001, since becoming a PRN employee she had established a pattern of unavailability
> well in excess of the three refusals allowed under Hospital policy.  Moreover, even if the handful
> of dates Ms. Fish now claims qualified for FMLA leave were taken out of consideration, I still
> would have discharged her for a pattern of unavailability.

[10]  The March 13, 2001 ESR, under "Remarks," reads: "Transferred to prn status 8/26/00 has had 6 call-ins
(2 "UU") since that time, refused work x6 requests, 3/13/01 no call, no show, unable to reach by phone or answering
machine."  Furthermore, the ESR employee's signature line reads "unavailable to sign."  A March 14, 2001 ESR
created also reflected Fish's termination.

When asked why Word did not present Fish with one of these ESRs to sign on March 14, 2001, Word
stated, "Because I had submitted [an ESR] on the 13th that had already gone over to HR."

2001 birth.  According to Fish, she assumed Word would complete an FMLA request based on Word's alleged statement that she was removing Fish from the work schedule until after she gave birth.  In the twelve months prior to April 15, 2001, Fish worked 721.17 hours for NEARMC.  *See* Affidavit of Phyllis Brimer, Payroll Coordinator.

Fish admits that no one at NEARMC ever suggested that her discharge was related to Fish's exercise of FMLA rights.  Nevertheless, Fish argues, her absences from work in May 2000 (when on FMLA leave for a miscarriage) and in October 2000 (when on placenta previa leave) were used as reasons to terminate Fish's employment.  According to NEARMC, the Hospital had the following unwritten employment policy at the time of plaintiff's employment: any PRN employee who refused or was otherwise unavailable for three or more requested assignments was subject to discharge for non-availability.  Simms, Vice President of HR, testified to the need for this alleged unwritten policy as follows: "The being available for PRN employees is critical in that it's flexible staffing.  The attendance policy doesn't address PRN availability."  On occasions when Fish called in "sick," Word asserted, Word did not question Fish about the nature of her illness.  In assessing Fish's lack of availability, Word testified, she considered all of the occasions where Fish refused to work or called in to decline work after previously agreeing to do so, which included those due to illness.  Word further testified that, notwithstanding the alleged FMLA-protected absences, Word still would have discharged Fish for unavailability based on Fish's record.  On the ESR Form requesting Fish's discharge, Word noted Fish was ineligible for rehire.  According to Word, she terminated Fish for lack of availability during her employment as a PRN nurse at the Hospital and also labeled Fish ineligible for rehire "[b]ecause she had a pattern of unavailability and could not fulfill her PRN requirements."

6

On December 3, 2002, plaintiff filed a complaint against NEARMC, which was amended on

January 17, 2003.    The amended complaint alleges the following FMLA-based violations:

interference with FMLA rights, retaliatory discharge, and retaliatory failure to rehire.[11]  *See* Amend.

Compl., Counts I-III.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery,

and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the

initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323.  "It is never enough

[for the movant] simply to state that the non-moving party could not meet their burden at trial."

*Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party

then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact

for trial. *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the

record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based

on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994)

(quotation omitted).  Summary judgment is required where the non-moving party merely repeats its

conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm*

*Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

---

[11] Fish contacted NEARMC several times to reapply at the Hospital and was told she was not eligible for rehire.  Amend. Compl, ¶¶ 37-39.

7

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.   NEARMC's Motion

The FMLA, NEARMC contends, was designed to balance workplace needs with the needs for employees to take leave for certain medical conditions and compelling family circumstances. *See* 29 U.S.C. § 2601(b)(1) & (2).  FMLA leave is available to an employee for several reasons, including the care of an immediate family member, such as a spouse, child or parent, if that family member has a serious health condition.  *Id.* at § 2612(a)(1)(C).  "The FMLA seeks to accomplish its purposes 'in a manner that accommodates the legitimate interests of employers.'" *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)(citation omitted).  NEARMC notes the two types of claims recognized under the FMLA:

> The FMLA recognizes two types of claims for alleged violations of [its] provisions: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, *see* 29 U.S.C. § 2615(a)(1)(1999); and retaliation claims, in which employers discharge [or otherwise engage in adverse employment action toward] employees for exercising their FMLA right to leave, *see id.* § 2615(a)(2).

*See O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2002).

8

### A.   Fish's Retaliation Claims

A *prima facie* case of FMLA discrimination/retaliation, NEARMC contends, requires the plaintiff to show: "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *See Hodgens* at 161.  Once that burden is met, the defendant must offer a legitimate, nondiscriminatory reason for its actions.  Then, the plaintiff must demonstrate that the employer's asserted reason is merely a pretext for unlawful discrimination.  *Id.* at 160 (applying *McDonnell Douglas/Burdine* burden-shifting test to FMLA claims); *see also O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353 (11th Cir. 2000); *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998); *Cline v. Wal-mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

Addressing Fish's retaliation claims,[12] NEARMC argues, neither the February 2001 reprimand nor the March 2001 discharge meet the above-listed requirements.  NEARMC first addresses Fish's February 2001 absences due to bronchitis.  NEARMC argues that Fish was not FMLA-eligible in February 2001.  Pursuant to the FMLA, an eligible employee may take up to twelve weeks of leave during any 12-month period for a serious health condition, among other things.  *See* 29 U.S.C. §§ 2601(b)(2), 2612(a)(1).  "Eligible employee" is defined as a person employed "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." *Id.*

---

[12] According to NEARMC, while plaintiff's amended complaint characterizes the February 16, 2001 reprimand as "interference" with FMLA rights, that claim clearly falls under the "retaliation" provision of the FMLA "in that the plaintiff is asserting that defendant adversely reprimanded her for taking leave in October 2000 and February 2001 that qualified as FMLA-protected."  Fish explains her interference claim in more detail in her summary judgment opposition, *see infra.*

§ 2611(2)(A).[13]  As of the time leave would have commenced for each of Fish's bronchitis-related absences in February 2001, NEARMC argues, Fish had worked for less than 1000 hours in the preceding twelve months.[14]  Thus, NEARMC argues, "she is not entitled to the protections of the Act regarding any absences that otherwise would have qualified for FMLA leave at that time."[15]

Moreover, NEARMC argues, Word's reprimand of Fish did not amount to an adverse employment action according to the standard set forth in *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001): "[T]o prove adverse employment action in a case under [the FMLA's] anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment."(Emphasis added).  *Davis* further holds that an employee's subjective belief that the action was adverse is not controlling.  Here, NEARMC observes, Fish was not suspended, demoted, discharged, or otherwise impacted by the February 2001 reprimand.  Instead, NEARMC argues, Fish was merely warned that disciplinary action could follow from too many absences.  *See Davis* at 1240 (holding that reprimand did not constitute adverse employment action where it had no tangible effect on plaintiff's employment); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283-84 (11th Cir. 1999).[16]

---

[13] Defendant also quotes FMLA regulations, which require "at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave." 29 C.F.R. § 825.110(a)(2).

[14] Again, the court notes that while February 2001 absences due to bronchitis were mentioned in plaintiff's amended complaint, *see* ¶¶ 16-17, Fish does not appear to rely on those incidents in her opposition to summary judgment.

[15] NEARMC relies upon the following cases: *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 797 (11th Cir. 2000)(affirming summary judgment for employer where employee had not met 1250-hour requirement); *Wells v. Wal-Mart Stores, Inc.*, 219 F. Supp. 2d 1197, 1207-08 (D. Kan. 2002)(same); and *Cantrell v. Delta Airlines, Inc.*, 2 F. Supp. 2d 1460, 1462 (N.D. Ga. 1998)(same).

[16] Specifically, *Graham* stated:

The Eleventh Circuit recently joined the First, Ninth, and Tenth Circuits in holding that Title

NEARMC contends that Fish's March 2001 discharge was not due to an accumulation of absences but rather Fish's "lack of availability." NEARMC repeats the importance of availability for PRNs and the Hospital's unwritten policy regarding lack of availability for such nurses. NEARMC emphasizes hospital records which show that from the time Fish became a PRN, Fish was unavailable on sixteen of the twenty-nine times (55%) she was contacted to work, not counting the February 2001 bronchitis-related absences which Fish claims were FMLA-protected.[17]

Regarding plaintiff's discharge, NEARMC contends, Fish cannot demonstrate the requisite causal connection between her March 2001 discharge and her February 2001 and October 2000 absences. First, NEARMC reiterates, Fish was not eligible in February 2001 for FMLA leave because she had less than 1250 cumulative hours. Second, NEARMC asserts, Fish was not FMLA-eligible at the time of her daughter's birth in April 2001 because she was no longer employed with NEARMC, since her employment had been terminated in mid-March 2001. According to NEARMC, although Fish had not requested FMLA leave for childbirth prior to her discharge, Fish would not have been eligible for such leave because she was not FMLA-eligible either at the time of her

---

VII's protection against retaliatory discharge extends to adverse actions which fall short of ultimate employment decisions. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998). Thus, actions such as undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable under the retaliation clause. (Citations omitted). Of course, "some threshold level of substantiality . . . must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Id.* The July 24, 1996 memorandum and the AWOL classification of two days in August simply do not meet the "threshold level of substantiality" required by the Eleventh Circuit in *Wideman*. Neither action constitutes an unwarranted negative job evaluation or disadvantageous transfer of responsibilities. The July memorandum merely expressed concern with plaintiff's absences and warned of possible ramifications . . . . In addition, plaintiff did not suffer any repercussions from either of these actions.

*Id.* at 1283-1284.

[17] Three of the sixteen referenced occasions, the court notes, appear correlated with Fish's placenta previa-related absences in October 2000.

11

discharge or when giving birth.[18]

Relying upon its previous arguments about Fish's alleged lack of availability, NEARMC similarly contends that Fish cannot show that she was discharged because of her October 2000 absences. NEARMC again highlights Fish's testimony that no NEARMC employee suggested that her discharge was related to her exercise of FMLA rights and that Fish never requested FMLA leave for those particular absences. NEARMC also argues that the five-month gap between Fish's October 2000 absences and her discharge is significant. *See Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001)(holding four-month period insufficient evidence of causation)(citing *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). Even if Fish's October 2000 absences were deemed close in time to her March 2001 discharge, NEARMC argues, this fact alone would be insufficient to establish the requisite causal connection. *See Strickland v. Water Works & Sewer Bd. of B'ham*, 239 F.3d 1199, 1207 n. 10 (11th Cir. 2001)("[C]lose proximity in time between the protected activity and the adverse employment action does not, standing alone, establish the third element of the prima facie case. Instead, the close proximity merely buttresses other evidence (direct or circumstantial) in the case indicating that the decision maker had notice of the protected activity.").

NEARMC also contends that Fish cannot demonstrate pretext. NEARMC repeats its stated motivation for terminating Fish, i.e., her pattern of lack of availability. NEARMC criticizes Fish's alleged reliance "on a chain of events that undermine the notion that the FMLA ever came into consideration." Again, NEARMC highlights Fish's admission that she never asked for FMLA leave and that no NEARMC employee suggested FMLA leave was considered at the time of her discharge.

---

[18] Brimer testified that Fish had only worked 721 hours in the twelve months preceding her discharge. Since Fish worked only one more day (March 14, 2001) prior to delivering her child in April 2001, NEARMC contends, Fish "clearly could not have accumulated sufficient hours to become FMLA-eligible from the time of her discharge until she gave birth a month later."

NEARMC relies upon *Walker v. Prudential Property & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)(a Title VII case): "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, [the court] must focus on the actual knowledge and actions of the decision-maker."

### B.    NEARMC's Refusal to Rehire Fish

NEARMC deems this claim "nothing more than plaintiff's retaliatory discharge claim under the guise of a failure-to-rehire claim," and as such, subject to summary judgment based on the above-stated reasons. Additionally, NEARMC relies upon the Eleventh Circuit's requirement that a plaintiff allege that the failure to rehire stemmed from a new and discrete act of discrimination separate from the original claim of discriminatory discharge. *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995)(citing *Burnam v. Amoco Container Co.*, 755 F.2d 893 (11th Cir. 1985)).[19] Since Fish has offered no new facts in support of her failure-to-hire/re-hire claim, the Hospital argues, the claim is unsustainable.

### C.    NEARMC's "Interference" with FMLA Rights - Failure to Reinstate Fish

To the extent Fish's claims may be based on NEARMC's failure to reinstate her following the April 15, 2001 birth of her child, NEARMC contends, that argument fails for two reasons: (1) Fish was not employed by the Hospital at this time, having been discharged no later than March 14, 2001; and (2) Fish was not otherwise FMLA-eligible at the time of her childbirth because she had much fewer than the required 1250 hours in the twelve months preceding the childbirth.[20] NEARMC

---

[19] The court notes that both *Hargett* and *Burnam* involved the timeliness of plaintiffs' EEOC charges alleging discrimination. In both cases, the Eleventh Circuit found that plaintiffs' claims regarding refusals to rehire did not constitute new and continuing violations of the ADEA and thus were time-barred.

[20] Relevant facts and arguments have been discussed earlier in this memorandum opinion.

relies upon *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)(affirming summary judgment to employer where former employee claimed entitlement to FMLA leave after discharge), as well as the statutory requirement of an eligible <u>employee</u>. (Emphasis added). *See* 29 U.S.C. § 2614(a)(1).[21]

## II.   Fish's Response

According to Fish, her three FMLA-based claims are (1) retaliation based on her termination "because the defendant considered protected leave in the decision to end her employment," (2) interference with FMLA rights "by disciplining [Fish] for protected absences in an attempt to discourage her from exercising her rights under the FMLA in the future," and (3) retaliation by "refusing to hire [Fish][after her termination] based on the fact that she had previously taken leave from work protected by the FMLA."

### A.   <u>Retaliation</u>

Pursuant to the FMLA, Fish argues, "an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute." *See Smith v. Bellsouth Telecommunications, Inc.*, 273 F.3d 1301, 1313 (11th Cir. 2001)(citation omitted). Fish contends that the FMLA prohibits an employer from discharging or disciplining an individual for taking FMLA-

---

[21] Despite NEARMC's contentions, the court notes, the *Smith* court held: "[A] former employee who alleges his former employer refused to hire him based on his past use of FMLA leave qualifies as an 'employee' under § 2617(a)(2)." *See* 273 F.3d 1303, 1307. *Smith* also distinguished *Brohm*:

> While Bellsouth argues that this case stands for the broad proposition that all FMLA rights cease after the termination of employment, the Sixth Circuit did not address the question of discrimination resulting from leave rights; it instead addressed the right to take leave, which obviously cannot be exercised after the termination of an employment relationship.

Furthermore, the Eleventh Circuit stated: "We have decided that Smith, a former employee who has applied for reemployment, is an 'employee' under the FMLA. If Smith proves that his past use of FMLA leave was a motivating factor in Bellsouth's refusal to rehire him, this is precisely the type of discrimination that the FMLA seeks to prohibit."

qualifying leave. *See* 29 C.F.R. § 825.220(a)(1997).[22]  Under the FMLA, Fish asserts, an eligible

employee may take up to twelve weeks of leave in a twelve-month period for the birth or adoption

of a child or an employee's "serious health condition." *See* 29 U.S.C. § 2612. Fish highlights the

FMLA's prohibition of retaliation against an employee who has exercised or attempted to exercise

rights under the statute. *See Smith* at 1313-14. Like defendant, plaintiff enumerates the requirements

for a plaintiff's *prima facie* case of retaliation under the FMLA as well as the burden-shifting

framework set out in *McDonnell-Douglas*.

    According to Fish, NEARMC considered FMLA-protected leave in deciding to terminate her

employment.  Since NEARMC agrees (1) that Fish's absences in April/May 2000 due to her

miscarriage and in October 2000 for placenta previa would be protected activity under the FMLA,

based on the testimony of Michael Simms ("Simms")[23] and (2) that Fish suffered an adverse job

action (termination), Fish contends that the only disputed issue is whether a causal connection exists

between Fish's termination and her May and October FMLA-protected absences from work.

Addressing defendant's arguments regarding her bronchitis-related absences in February 2001, Fish

asserts that her ineligibility for FMLA leave in February 2001 is immaterial to her retaliation claim.

Furthermore, Fish argues, it is immaterial that Fish did not have the requisite number of hours in the

twelve months preceding her termination; rather, Fish asserts, courts focus on whether an employee

---

[22] Current 29 C.F.R. § 825.220 notes that the Act prohibits an employer from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act; from discharging or in any other way discriminating against any person for opposing or complaining about any unlawful practice under the Act; or from discriminating against employee or prospective employees who have used FMLA leave.

[23] NEARMC designated Mr. Simms, Vice President of Human Resources, as its representative regarding the Hospital's policies and procedures for employee leave, FMLA, and hiring/discipline/scheduling/terminations. The court notes that Simms testified as follows: "*Q: What qualifies as a serious illness of self or family under the policy?* A: Just basically, you know, defined by the law itself. *Q: And what would that be?* A: The physician makes the determination. You know, pregnancy would be part of that — birth of a child, excuse me, would be part of that." *See* Def. Ex. 1 Vol. II, at 20.

was punished for taking, or attempting to take, protected leave. *See Smith*; *Butler v. Owens-Brockway Plastic Prods., Inc.*, 199 F.3d 314 (6th Cir. 1999); *Duckworth v. Pratt & Whitney*, 152 F.2d 1 (1st Cir. 1998). Fish relies upon *Butler*, in which the Sixth Circuit rejected a employer's argument that plaintiff's retaliation claim was improper because plaintiff was ineligible for FMLA leave at the time of her termination. In that case, Fish argues, the plaintiff had taken leave in 1994 and 1995 which should have been FMLA-protected, but the plaintiff had not worked the requisite hours required by the FMLA when she was terminated in 1995. The Sixth Circuit, Fish emphasizes, applied the FMLA hours of service requirements only to the twelve months prior to the commencement of leave, not the twelve months preceding the adverse employment action.[24]

Based upon the foregoing, plaintiff contends, the only FMLA eligibility question this court should consider is whether Fish was eligible for FMLA leave in May 2000 and October 2000. According to Fish, it is undisputed that NEARMC approved FMLA leave for Fish in May 2000 (demonstrating her eligibility at that time). Furthermore, Fish argues, her placenta previa-related absences in October 2000 would have qualified for FMLA leave (considering that she had worked 1311 hours for NEARMC in 2000 and had been employed longer than a year).

_____

[24] Fish provides the following excerpt from Butler:

> If this court were to adopt the defendant's argument that an employee must always be "eligible" at the time of the adverse action, the Act would establish a perverse set of incentives. While an employee is "eligible" for leave, he may take it. But if he takes twelve weeks of leave, on the day he returns to work he is no longer "eligible" for continued leave at that time. Because he is not currently "eligible" for leave, his employer may terminate him for excessive absenteeism, and he will have no recourse under the Act. This strange scenario, certainly not contemplated by the drafters of the Act, would result if an employee had to be an "eligible employee" at the time of the adverse action rather than at the time of the commencement of the leave. We do not believe that this is what Congress intended. If Congress had intended this result, it would not have included the remedies of "employment, reinstatement and promotion." Only a former employee can be "reinstated" and only a prospective employee can be "employed."

*See Butler* at 316.

As to causal connection, Fish contends, she "must establish that Ms. Word, the decision maker with respect to her termination, was aware that Mrs. Fish was unavailable to work for a potentially qualifying FMLA reason," relying upon *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997).[25]  Fish contends that once Ms. Word's knowledge is established, Fish need only show that the "protected activity and the negative employment action are not completely unrelated." *See E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).  Fish offers the following evidence to prove Word's knowledge (that Fish's May and October unavailability was FMLA-protected): (1) the FMLA approval document signed by Word for April 28th to May 15th, 2000; and (2) Fish's testimony that she notified Word of her placenta previa.[26]

---

[25] In *Raney*, the Eleventh Circuit stated: "In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."(citation omitted).

[26] Fish testified as follows:

*Q: Okay.  Did you ever tell Ms. Word that you had placenta previa?*
A: Yes.
*Q: Okay.  When did you tell her?*
A: It would have been when I found out.
*Q: Okay.  When did you find out?*
A: Would have been when I went to the physician.  When I went to the doctor's office.  I don't recall the exact date.
*Q: And this would have been when you went to Dr. Daniel's office?*
A: Yes.
*Q: And after you found out, did you tell her immediately that you had placenta previa?*
A: As far as I can recall, yes.
*Q: Okay.  What exactly did you tell her?*
A: I don't recall the exact conversation.
*Q: Do you remember anything about that conversation?*
A: No.  It's a [*sic*] been so long ago.  I don't remember the exact –
*Q: Okay.*
A: Exact words.
*Q: Where did that conversation take place?*
A: I don't recall if I came to see her or if I phoned her over the telephone.
*Q: Did anyone witness that conversation?*
A: I don't remember.
*Q: And what did Ms. Word say in response?*
A: I don't recall her exact response.

*See* Def. Ex. I, Vol. I, at 67-68.

Moreover, Fish asserts, evidence shows that Word considered Fish's May and October leaves from work as reasons for her termination. Fish relies upon both her own belief that causation exists and Word's testimony regarding the February 2001 write-up for eight "call-ins":

> *Q: Defendant's Exhibit 2 says she had eight call-ins. Do you remember what those were for?*
> A: Not specifically each one, no.
> *Q: How did you make the decision to issue this written counseling?*
> A: When I was aware that she had exceeded the six call-in limit.
> *Q: How did you become aware of that?*
> A: On a weekly basis, we do payroll and I am notified of call-ins that occur from the nursing supervisors. And then I keep a running tally of those.
> *Q: Did you check as to why she had called in?*
> A: I don't know.
> . . . .
> *Q: So if the reason – do you look at all to see why someone called in before – did you look at all to see why she called in before you determine if the counseling was appropriate?*
> A: Yes.
> *Q: You did. Do you recall why she called in?*
> A: She had multiple reasons. I mean, they were differing for each episode.
> *Q: Do you remember what the call-ins were?*
> A: I can look at her schedule and tell you when. She called in March 29 through April 4. There were four shifts scheduled there that she called in for in 2000.
> *Q: And what was her reason for calling in?*
> A: I don't have a specific reason, just that she called in sick. She called in again on April 28th of 2000.[27]
> *Q: And what was the reason she gave then.*
> A: I don't have a specific reason, just that she called in sick. She was on bereavement leave May 1 and May 2.
> *Q: And at that time she was a full-time RN; correct?*
> A: That's correct.
> *Q: Was she entitled to bereavement leave?*
> A: Yes.
> *Q: The next call in?*
> A: She called in again May 7 through May 14.[28]

---

[27]Fish's FMLA leave for her miscarriage began on this date. Defendant argues, however, that the leave had only been conditionally approved pending medical certification and was later canceled when plaintiff voluntarily returned to work on May 15th.

[28] Fish observes that these absences fell within the period of Fish's protected FMLA leave due to her miscarriage.

*Q: And what was the reason for that?*
A: All I know is that she called in – I'm sorry.  May 8, not May the 7th.  May 8 she called in sick, and she was out through the 14th.  Her next episode was October the 11th of 2000; she was out the 11th and 12th.[29]
*Q: What was the reason for that absence?*
A: All I know is that she called in sick.  October 19th she had an unexcused absence, meaning she did not call.  She just did not show up for work.
*Q: Did she ever tell you why she was absent that day?*
A: No.

Word further testified that when Fish did not appear or call in for a scheduled shift on March 13, 2001, Word examined Fish's work record for the past twelve months and considered her pattern of unavailability.  Word stated that she considered instances where Fish declined to work shifts due to illness, which Fish contends would encompass her May 2000 FMLA leave for her miscarriage and her October 2000 placenta previa leave.  Fish characterizes Word's testimony that she considered all of Fish's absences (including illness-related absences) from work between March 2000 and March 2001 as direct evidence of retaliatory motive.[30]  Based on the foregoing, Fish argues, the evidence "demonstrates that Mrs. Fish's termination was not wholly unrelated to her protected leave in May and October 2000."  Addressing NEARMC's argument about the time lapse between plaintiff's allegedly protected leave and her termination, Fish asserts, the court may infer a causal connection in the absence of temporal proximity as long as there is other evidence indicating such a connection.  *See, e.g., Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892 (3rd Cir. 1993).

To establish pretext, Fish contends, a plaintiff may (1) show that the employer's stated

---

[29] These instances occurred when Fish was on doctor-mandated bedrest for placenta previa (between October 12, 2000 and November 3, 2000).

[30] Fish defines "direct evidence" as evidence which, if believed, proves the existence of a fact at issue without inference or presumption.  *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)("Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.")  The court does not agree that this evidence is "direct" evidence.

reasons for its adverse action are not credible or were motivated by a discriminatory reason, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981), or (2) illustrate the weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions.  *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998).[31] According to Fish, the asserted reason for her termination – "lack of availability" – is clearly pretextual, considering the following: (1) defendant separately cited "inability to fulfill PRN requirements" and "lack of availability" as reasons for Fish's termination; (2) at the time of Fish's termination, no NEARMC document set out the minimum level of availability for nurses on PRN status; thus, Fish contends, the Hospital is alleging violations of "'availability standards' which did not exist and/or had not been published to Mrs. Fish";[32] (3) "Mrs. Fish's work history and employee

---

[31] Fish further relies upon *Hodgens*: "Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility  that an employer could manipulate its decisions . . . ." *Id.* at 167.

[32] Simms testified that the employee discipline policy did not apply to PRN attendance:

*Q: So you are saying . . . the discipline policy in the employee handbook would not apply to PRNs with respect to attendance requirements?*
A: Right.
*Q: Why do you say that?*
A: It would require six occurrences for a counseling as the attendance policy is written.  But in the case of PRN employees, the practice has been: Unavailable or refusing three assignments can be grounds for discipline action, including termination." *See* Def. Ex. I Vol. I, at 32-33.

Later, the court notes, Simms testified:

*Q: You were asked some questions about the interrelationship between the attendance policy and discipline policy.  If you look at Defendant's Exhibit 2 [the February 16, 2001 write-up for excessive call-ins], with respect to PRNs, the attendance policy with respect to just going to work would apply to them, right?*
A: Yes.  The attendance policy, in the sense of call-ins and no reports would apply.  What wouldn't apply is the availability, which is a different issue.  The being available for PRN employees is critical in that it's flexible staffing.  The attendance policy doesn't address PRN availability.
*Q: And you were also asked some questions about the disciplinary policy.  The disciplinary policy gives the hospital the discretion to terminate an employee's employment; isn't that correct?*
A: Yes.  The discipline policy would apply to every employee.

Simms then testified that the 8-call-in written counseling is considered discipline.

20

evaluations demonstrate that her attendance/being unable to work shifts had not been an issue for Ms. Word/the defendant until _after_ Mrs. Fish was unable to work for the defendant due to FMLA qualifying reasons;"[33] and (4) Word admitted to considering Fish's illness-related absences in her decision to terminate.[34]

While defendant argued that Fish did not specifically request FMLA leave for her October 2000 absence, Fish contends, the FMLA only requires an employee to request leave and state the reasons for the leave − not mention FMLA by name or refer to any legislation. _See_ 29 C.F.R. § 825.303(b); _Strickland_, 239 F.3d at 1209 (11th Cir. 2001).[35] According to Fish, the FMLA places the burden on the employer to classify the request for leave as FMLA-qualifying and to give appropriate notice to the employee. _See_ 29 C.F.R. § 825.302(c); _Strickland_ at 1209. Similarly, plaintiff argues, the employer bears the responsibility to determine whether or not the FMLA applies and to consider requested leave as FMLA leave. _See_ 29 C.F.R. § 825.303(b); _Price v. City of Fort Wayne_, 117 F.3d 1022, 1026 (7th Cir. 1997). Plaintiff repeats that a reasonable jury could conclude that NEARMC impermissibly "counted Mrs. Fish's use of FMLA leave against her" in the termination decision.

Additionally, Fish argues, the Hospital's refusal to rehire her constitutes retaliation in violation of the FMLA. Countering NEARMC's contention that Fish's failure to hire claim arises from and is indistinguishable from her termination claim, Fish argues, a refusal to rehire can

---

[33] On May 8, 2000, Fish notes, Word signed Fish's performance evaluation, which showed Fish's attendance to be "at or above acceptable level" despite her five call-ins in the prior 12 months. The next day, Fish contends, Word signed an ESR showing that NEARMC was placing Fish on FMLA leave (retroactive to April 28, 2000). Only after Fish had to miss work for a FMLA-protected pregnancy condition, Fish argues, did Ms. Word begin to have problems with Fish's availability.

[34] These facts have been discussed earlier in this memorandum opinion.

[35] Contrary to the statutory requirements, plaintiff argues, Hospital policy required employees to specifically request leave under the statute. _See_ Def. Vol. I Ex. I, at 24, 26.

constitute a new act of discrimination.  *See E.E.O.C. v. City of Norfolk Police Dep't*, 45 F.3d 80, 82

(4ᵗʰ Cir. 1995)(citing *Burnam v. Amoco Container Co.*, 755 F.2d 893, 894 (11ᵗʰ Cir. 1985)).

According to Fish, courts have distinguished between a new application for employment and a

demand for reinstatement which seeks to redress the original termination, relying upon *Johnson v.*

*The New York Hospital*:

> A discharged employee who seeks to be reinstated is really litigating the
> unfairness of his original discharge because only if the original discharge was
> discriminatory is he entitled to be reinstated as if he had never ceased working
> for the employer.  The word reinstatement must be employed in this connection
> as the equivalent of uninterrupted employment . . . . The concept of a discriminatory
> refusal to hire is a different concept.

*See* 1998 U.S. Dist. LEXIS 19099, at *9 (S.D.N.Y. 1998)(citing *NLRB v. Textile Machine Works*, 214

F.2d 929, 932 (3d Cir. 1954)).[36]

Here, Fish argues, she has alleged facts consistent with a discriminatory refusal to hire as

opposed to a refusal to reinstate, and she applied for a job after her termination as opposed to

demanding reinstatement.  In support of her contention that the refusal to rehire was separate from

the act of termination, Fish points to the discrepancy between the initial termination document and

a later termination-related document; the former listed Fish as being ineligible for rehire, while the

latter was silent on the issue.[37]  Fish also draws the court's attention to Simms's testimony that the

---

[36] *Johnson* addressed the distinctions between reinstatement and re-hire in the context of a res judicata bar
and *NLRB* addressed them in the context of the limitation period for filing an "unfair labor practice" claim under the
National Labor Relations Act.

[37] Specifically, Simms testified:

> A: On this document, it's not checked yes or no.  This is the terminating document
> which removes someone from payroll.
> *Q: Is that the document where if someone were to be designated "do not rehire,"*
> *they would be designated "do not rehire."*
> A: That would be the document.  Yes.
> *Q: So based on that document, do you have an opinion as to whether Ms. Fish is*

decision to rehire is done on an individual basis by looking at factors including references and the passage of time since termination. According to Fish, "This suggests that the decision to not decline hiring Mrs. Fish was made independent of the decision to terminate her employment, even if the same reasons were used to justify both."[38]

### B.    Interference with Fish's Rights under the FMLA

Under the FMLA, Fish contends, an employer may not interfere with, restrain, or deny the exercise of or attempt to exercise FMLA-provided rights, and an employer's violations subject the employer to civil actions. *See* 29 U.S.C. §§ 2615(a)(1), 2617(a). Fish highlights Word's testimony that the February 16, 2001 write-up was intended to give Fish an opportunity "to correct her [attendance] problem." Fish further argues, "Stated differently, the disciplinary action was intended to discourage Mrs. Fish from taking FMLA protected leave in the future. The disciplinary action amounted to a restraint and interference on Mrs. Fish's future ability to take FMLA leave during her employment with the defendant."

### III.    NEARMC's Reply

#### A.    General Assertions

While defendant's motion for summary judgment addressed four perceived FMLA claims, defendant observes that plaintiff's opposition to summary judgment now alleges three FMLA violations. Defendant states: "[T]o the extent plaintiff alleged any other claims in her Amended Complaint, she has abandoned those claims and defendant is entitled to judgment as a matter of law on those claims."

---

*eligible for rehire.*
A: Looking at that document, it was omitted.

[38] The court assumes that plaintiff meant "to decline" rather than "to not decline."

Defendant criticizes plaintiff's contention that she was actually "placed" on leave in April and May of 2000 as a result of miscarriage complications. In fact, NEARMC asserts, NEARMC conditionally approved plaintiff for FMLA leave to be retroactive to April 28, 2000 *pending medical certification.* (Emphasis added). Since plaintiff voluntary returned to work on May 15, 2000, the date of NEARMC conditionally approved the leave, her FMLA request was cancelled.[39] Therefore, defendant argues, even if it had considered these April-May 2000 absences in its decision to terminate her, such consideration would not constitute an interference with her FMLA rights. Citing Word's assistance to plaintiff in identifying her potential qualification for FMLA leave and her submission of FMLA paperwork on plaintiff's behalf, defendant argues: "Ms. Word's actions undermine plaintiff's contention that Word's subsequent actions were undertaken with the intent to violate plaintiff's FMLA rights." However, defendants assert, Word did not consider the April-May 2000 absences in deciding to discharge Fish, as indicated by the March 13, 2001 ESR which states that Word's decision was based on plaintiff's availability since becoming a PRN employee in August 2000 (several months after the absences at issue).[40]

Although Fish negatively construed the Hospital's alleged unwritten policy regarding PRN attendance requirements, NEARMC argues, plaintiff has not effectively challenged Simms's testimony that such a policy existed. Defendant argues that the fact that a policy is unwritten does not undermine its credibility, and Fish has failed to show that the policy was unfairly applied to her in comparison to other PRNs. *See Taylor v. White*, 321 F.3d 710, 717 (8th Cir. 2002)("if it is permissible to rely upon a salary retention policy, the unwritten nature of the policy . . . cannot,

---

[39] According to NEARMC, Fish never obtained the necessary authorization.

[40] *See supra* note 10.

standing alone, support an inference of discrimination); *Rivera v. Pitt*, 2002 WL 1986461, at *1 (10th

Cir. 2002)("A plaintiff who wishes to show that the company acted contrary to an unwritten policy

or to company practice often does so by providing evidence that he was treated differently from other

similarly-situated employees who violated work rules of comparable seriousness.")

**B.**     **Retaliatory Discharge**

Defendant again references a discrepancy between Fish's amended complaint and her

opposition brief.  In the former, NEARMC argues, Fish alleged that she was discharged not only for

FMLA-protected absences in October 2000 and February 2001, but also for purported absences

related to the birth of her child in April 2001.  In the latter, defendant argues, plaintiff relies instead

only her October 2000 and February 2001 absences.[41]

Despite plaintiff's assertions to the contrary, NEARMC contends, defendant has not claimed

that the retaliation claim fails because Fish was not FMLA-eligible <u>at the time of the adverse</u>

<u>employment action</u>, i.e., her March 2001 discharge.  Rather, defendant contends, it has considered

Fish's eligibility at the time when leave commenced.  Since the February 2001 absences were not

FMLA-protected, NEARMC argues, Fish must demonstrate that she was discharged in retaliation for

her October 2000 absences.  NEARMC repeats its contention that the different reasons given for

Fish's discharge –"lack of availability" and "inability to fulfill PRN requirements" – are not

contradictory.  Most importantly, NEARMC argues, Fish has not addressed or offered evidence to

contradict Ms. Word's testimony that she would have discharged plaintiff for lack of availability,

regardless of her October 2000 absences.  From the time Fish became a PRN until her discharge,

---

[41] Again, the court observes, plaintiff's opposition memo stated: "Mrs. Fish's ineligibility for FMLA leave in February 2001 is immaterial to her retaliation claim."

NEARMC repeats, Fish had at least thirteen non-FMLA-protected absences which have not been denied by Fish. NEARMC again emphasizes its unwritten policy regarding PRN availability.

Additionally, NEARMC argues, Fish's failure to challenge the fact she would have been fired anyway means her claim fails as a matter of law. *See Steger v. Gen. Electric Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003)(finding that even if impermissible facts had been considered by employer, employer could avoid liability by showing that it nevertheless would have made the same decision absent consideration of other factors)(citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)); *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999)("In an employment discrimination or retaliation case, even if the plaintiff provides evidence that the defendant, in making an adverse employment decision, was motivated in part by an impermissible consideration, the defendant can prevail if it can prove by a preponderance of the evidence that it would have made the same decision even in the absence of the discriminatory consideration.")

### C.      Retaliatory Failure-to-Rehire Claim

NEARMC repeats its argument that Fish's retaliatory discharge claim is not separate and distinct from her retaliatory failure-to-rehire claim, relying upon Word's testimony that the "do not hire" designation and Fish's discharge were based upon the same reasons. Furthermore, NEARMC asserts, Simms testified that the general rule is that employees discharged for cause are not rehired but that, generally speaking, an exception may be made based on factors such as a former employee's performance since leaving NEARMC and the length of time between the new application and the employee's discharge. In plaintiff's case, NEARMC argues, Simms testified to not taking these considerations into account and further testified that he had no personal knowledge of why the

designation "do not hire" was placed in plaintiff's file but instead had to rely on Word's paperwork.[42]

Additionally, NEARMC contends, the amended complaint itself offers the same facts in support of

both the retaliatory discharge and failure-to-rehire claims. *See* Amend. Compl. ¶¶ 40, 56, 62. Again,

NEARMC argues, the plaintiff is simply re-characterizing her discharge claim as a failure-to-rehire

claim. *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995)(citation omitted).

### D.     "Interference" Claim - February 2001 Reprimand[43]

NEARMC contends that plaintiff has provided no support for this claim.   Specifically,

NEARMC argues, Fish does not dispute her ineligibility for FMLA leave in February 2001 and thus

cannot argue that NEARMC interfered with her FMLA rights, at least with respect to the February

2001 absences.   More importantly, NEARMC asserts, Fish has not challenged or mentioned the fact

that the reprimand does not qualify as an "adverse employment action" because it did not result

(either immediately or subsequently) in an adverse action being taken against her.[44]

### CONCLUSIONS OF THE COURT

The court starts with the recognition that some of the plaintiff's claims are meritless.   These

are:

(1) Plaintiff has not established any retaliation claim based upon the FMLA leave for April-

May 2000.  First, the leave was suggested by and aided by Word.  Second, the time lapse between

---

[42] The court notes that while Simms testified that Word labeled Fish "do not rehire," when asked, "Do you have any firsthand knowledge as to why Ms. Fish would not be eligible for rehire," Simms did not respond "yes." Simms did then refer to documents related to Fish's termination.

[43] NEARMC repeats its earlier argument that this claim would be more appropriately characterized as a "retaliation" rather than an "interference" claim.

[44] Again, NEARMC relies upon the Eleventh Circuit's holdings in *Davis v. Town of Lake Park* and *Graham v. State Farm Mutual Insurance Co.*.

the discharge and the leave is substantial.  Third, and perhaps most importantly, plaintiff was not in PRN status in April-May 2000.  It is clear that her discharge was based on "unavailability" after plaintiff was in PRN status.  The court's analysis applies to both the discharge and failure to rehire claims.

(2) There can be no claims based upon the February 2001 bronchitis situation or the February 2001 reprimand.  First, as to the alleged interference claim based on the February 2001 warning or counseling, the court concludes that such a claim has no merit because it did not involve denying a benefit.  *See Russell v. North Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003); *see also O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000).  The court does not reach the issue as to whether such a claim can be maintained in view of the fact that plaintiff was not then FMLA eligible.  Second, there is no retaliation claim based on the February 2001 reprimand, because there was no adverse action, only counseling or warning.  The court does not reach the issue of whether there can be a retaliation claim based on the February 2001 reprimand if plaintiff was not then covered by the FMLA.

Ultimately, the court concludes that the only possible basis for any claim by the plaintiff is a retaliatory discharge claim related to the October 2000 placenta-previa illness.[45]  In that regard, the court assumes that "placenta previa" is a serious medical condition.  Further, the court assumes that Word was told of it and that since Word is a nurse manager, she would know of its serious nature.

The evidence suggests that plaintiff had worked the hours necessary to be FMLA-eligible as

---

[45] The court concludes that there is no reasonable inference of an independent retaliatory decision not to rehire.

of October 2000.[46]  The case which perhaps presents the closest fact situation to the instant case is

*Manuel v. Westlake Polymers Corp.*, 66 F.3d 758 (5th Cir. 1995).  In *Manuel*, the plaintiff had a

history of absenteeism.  After receiving a written warning advising her that continued absenteeism

could result in suspension or termination, the plaintiff took a month's leave (not specifically

designated as FMLA leave) for complications from an in-grown toenail.  She apparently stayed in

constant contact with her employer during this leave period.  When she returned to work, she was

suspended for four days and issued a final warning letter.  Less than two months later, when Manuel

missed work again for a separate, non-FMLA qualifying reason, Westlake terminated her for

persistent attendance problems, pursuant to its no-fault attendance policy.  The employee alleged an

---

[46] While it does not appear that the plaintiff requested FMLA leave in October 2000, *Strickland* states:

> Where an employee's need for FMLA leave due to a serious medical condition is
> unforeseeable, the advance notice requirement does not apply, and we have said
> that "the employee need only provide [his] employer with notice sufficient to make
> the employer aware that [his] absence is due to a potentially FMLA-qualifying
> reason." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997).  The
> Code of Federal Regulations makes clear that an employee taking unforeseeable
> leave "need not expressly assert rights under the FMLA or even mention the FMLA,
> but may only state that leave is needed." 29 C.F.R. 825.303(b).  Once an employee
> taking unforeseeable leave informs his employer that potentially-qualifying leave
> is needed, the regulations place on the employer the burden of ascertaining whether
> the employee's absence actually qualifies for FMLA protection. *See id.* ("The
> employer will be expected to obtain any additional required information through
> informal means.")

Further, 29 C.F.R. § 25.302(c) provides:

> An employee shall provide at least verbal notice sufficient to make the employer
> aware that the employee needs FMLA-qualifying leave, and the anticipated timing
> and duration of the leave.  The employee need not expressly assert rights under
> the FMLA or even mention the FMLA, but may only state that leave is needed
> for an expected birth or adoption, for example.  The employer should inquire
> further of the employee if it is necessary to have more information about
> whether FMLA leave is being sought by the employee, and obtain the necessary
> details of the leave to be taken.  In the case of medical conditions, the employer
> may find it necessary to inquire further to determine if the leave is because of
> a serious health condition and may request medical certification to support the need
> for such leave. (See § 825.305).

FMLA violation based on her employer "counting her October-November 1993 absences as an additional step in its 'no-fault' policy." The trial court granted summary judgment for the employer, but the Fifth Circuit reversed and remanded (with no opinion as to whether the in-grown toenail constituted a serious medical condition). The Fifth Circuit held that the FMLA did not require "an employee to invoke the language of the statute to gain its protection when notifying her employer of her need for leave for a serious health condition" and further stated:

> [C]ontrary to Westlake's suggestion, permitting employees to avail themselves of the FMLA's protection without expressly invoking the statute does not leave employers such as Westlake without protection from abuse of the Act's generous provisions, nor does it require employers to engage in intrusive inquiries to determine whether the FMLA applies. The Act permits employers notified of an employee's intent to take leave due to a serious health condition to require the employee to provide certification from a physician. If the employer has reason to doubt the validity of the certification, it may ask for a second opinion from a different physician. If the second opinion differs from the first, the employer may require a third opinion. Moreover, the employer may require recertification on a reasonable, on-going basis. In short, the FMLA provides safeguards from delinquent employees, but express notice by an employee that she takes leave pursuant to the FMLA is not one of these safeguards. (citations omitted).

*Id.* at 763-64.[47]    Additionally, the *Manuel* court stated: "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."[48]

While there are close factual and legal issues, this court cannot determine at this stage that

---

[47] *See also Peters v. Community Action Committee, Inc. of Chambers-Tallapoosa-Coosa*, 977 F. Supp. 1428, 1436 (M.D. Ala. 1997)(stating that "CAC suggests that Peters is not entitled to the protection of the FMLA because she did not notify it that she was taking leave pursuant to the FMLA. There is no merit to this suggestion.")

[48] 29 C.F.R. § 825.220(c) is also worth noting: "An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave . . . . [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." It is unclear to the court whether NEARMC has such a no-fault policy.

a reasonable jury could not find that the placenta previa-related absences were considered as a negative factor with regard to the discharge decision. Defendant's assertion that it would have discharged plaintiff even if those absences were not considered is an affirmative defense which this court cannot determine as a matter of law.

The motion will be granted as to all claims except the potential claim of retaliatory discharge based upon the October 2000 absences. Evidence as to the other claims may or may not be admissible at trial. The court will carefully reconsider the evidence at trial.[49]

This ____ of November, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[49] The court notes that there <u>may</u> be an inconsistency between its ruling and the retaliation decision in *Strickland*. The facts, however, appear to be distinguishable. Additionally, *Bailey v. Amsted Industries, Inc.*, 172 F.3d 1041 (8th Cir. 1999) may suggest a different conclusion. *Bailey*, however, came after a bench trial subject to a clearly erroneous factual review. Further, there was a holding that the plaintiff did not give notice as to foreseeable absences. *Cf. Taylor v. Invacare Corp.*, 2003 WL 21212674 (6th Cir. 2003). At trial, the court may ask for special verdicts with regard to what absences considered by the defendant were and were not FMLA-protected. There could thereafter be further analysis of the type in *Hodgens v. General Dynamics*, 144 F.3d 151 (1st Cir. 1998).